# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS
OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR
CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN
UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A
COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG
WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO
THE ACTION.

RENDERED: SEPTEMBER 28, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0104-MR

ROBERT STONE                                               APPELLANT

ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
NO. 20-CR-0967-002

V.

COMMONWEALTH OF KENTUCKY                               APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Kenton County Circuit Court jury found Robert Stone guilty of robbery in the first degree, burglary in the first degree, and assault in the second degree. The jury recommended a sentence of thirty years, which the trial court then imposed. Stone appeals to this Court as a matter of right.[1] Stone raises several claims of error: the trial court allowed a witness to testify about the contents of a letter from the codefendant; the trial court allowed testimony that Stone was identified through a database available to law enforcement; the trial court should have granted a directed verdict on burglary and robbery in the first degree; and the Commonwealth committed prosecutorial misconduct

---

[1] Ky. Const. § 110(2)(b).

during closing arguments. Upon review, this Court finds no error and thereby affirms the judgment of the Kenton County Circuit Court.

## I. FACTS AND PROCEDURAL BACKGROUND

James Thompson lived in the Golden Tower on the eleventh floor. On June 5, 2020, surveillance footage showed Anthony Cornist, together with an unidentified woman, and a man later identified as Robert Stone get off the elevator together and approach Thompson's apartment door. The unidentified female knocked on Thompson's door while Stone and Cornist hid from the view of the peephole by standing flat against the wall beside the door. When Thompson opened the door Cornist and Stone pushed Thompson inside his apartment and Stone began striking him. Soon after, the camera footage shows Stone punching Thompson outside of his apartment where he fell. Stone kicks Thompson as he lay on the floor. Stone appears to remove something around Thompson's neck and goes through his pockets while either Cornist or Stone shouted, "Get the T.V"! Cornist picks an item off the floor that had dropped during the assault. Stone and Cornist head to the elevator where the unidentified female waits with the door held open. Thompson suffered a broken arm and orbital bone, required stitches above his eye, and had pins permanently placed in his arm.

Shannon Wilson was the property manager at the Golden Tower where Thompson and Cornist lived. Thompson reported the assault to Wilson. When she confronted Cornist about it, Cornist handed her a letter. Wilson testified at trial from the contents of the letter wherein Cornist acknowledged it was him in

2

the surveillance video but disavowed any knowledge of the identities of his two companions.

Detective Gregory Andrews from the Covington Police Department testified. He initially could not identify Stone from the surveillance footage, but he did take note of the distinctive tattoo on Stone's neck. Detective Andrews testified that he later was able to identify Stone from a "database available to Kentucky law enforcement." Detective Andrews was able to locate a photograph of Stone, with the identical tattoo, labeled "Cornist family reunion, Cincinnati, OH, 2012," from a social media account.

Stone testified that he went with Cornist, his uncle, to talk to Thompson in order to clear up a dispute between the two men. He claimed, in the course of this conversation, that Thompson invited them inside and then assaulted him first and that he merely defended himself. He denied knowing the identity of the unknown female and yet called her a friend. He acknowledged the surveillance footage showed him leaning flat against the wall while his unknown friend knocked on the door but claimed he only did so in order to rest. And when the video showed him going through Thompson's pockets as he lay helpless on the ground after the assault, Stone claimed he was only trying to help him.

On October 1, 2020, Stone was indicted by a Kenton County grand jury for complicity to robbery in the first degree, complicity to burglary in the first degree, and complicity to assault in the second degree. Stone was tried together with Cornist after which the jury found Stone guilty on all three counts and

3

sentenced him to thirty years in prison. Further facts will be adduced as necessary, so we now address the merits of his appeal.

## II. ANALYSIS

Stone argues that the trial court violated his Sixth Amendment right of confrontation by allowing testimony prohibited by *Bruton v. United States,* 391 U.S. 123 (1968). Stone also contends testimony regarding his identification from a database should have been excluded under KRE[2] 404(b). Stone argues further that the trial court should have granted a directed verdict on the Robbery and Burglary charges. Additionally, Stone asserts the Commonwealth committed misconduct during its closing arguments.

### A. The trial court did not err when it allowed into evidence a portion of the codefendant's letter.

Cornist wrote a letter to Wilson describing his involvement in the assault and robbery. The trial court permitted Wilson to testify to a portion of its contents wherein Cornist admitted his involvement but denied knowing the other people with him. Stone contends this statement violates his right of confrontation as protected by *Bruton v. United States.* This issue is preserved.

*Bruton* stands for the proposition that when two or more codefendants are tried jointly, the trial court must exclude any out-of-court statements that incriminate, even implicitly, any non-declarant defendant even if the trial court could issue a limiting instruction to the jury.[3] *Bruton* applies where "the

---

[2] Kentucky Rules of Evidence.
[3] The trial court did not give a limiting instruction in this case. Stone concedes that none was requested. As we held in *Quisenberry v. Commonwealth,* a trial court

4

powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." *Bruton,* 391 U.S. at 135-36.

The statement at issue in this case comes from a letter written by Cornist and hand delivered to Wilson wherein Cornist admits he was the individual on the video but states he does not know the others who were present with him. Stone's assertion that it should be excluded under *Bruton* is perplexing because, in the language of *Bruton,* it is not an incriminating statement. It is a statement that disavows any knowledge of Stone or his identity and cannot be said to be incriminating. Stone claims that because there is a reference to his existence it should have been excluded under *Gray v. Maryland.* 523 U.S. 185 (1998). *Gray* was an extension of *Bruton* where the U.S Supreme Court held that a non-testifying co-defendant's statement, as redacted by the trial court, should have been excluded because it remained directly inculpatory as to the defendant. *Id.* at 194. Stone's reliance on *Gray* is likewise misplaced. In *Gray,* the confession at issue was a statement that directly implicated somebody in the crime—only the identity was omitted. It was as follows:

Question:   Who was in the group that beat Stacey?

Answer:     Me, deleted, deleted, and a few other guys.

*Id.* at 196. In *Gray,* after the detective testified to the above, the prosecutor asked, "after he gave you that information, you subsequently were able to

---

need not instruct the jury unless it is requested by the objecting co-defendant. 336 S.W.3d 19 (Ky. 2011).

5

arrest Mr. Kevin Gray; is that correct?" The officer responded, "That's correct." *Id.* at 188-89. In the present case there is no statement implicating Stone in the crime, either explicitly or implicitly, only that Cornist did not know either of the people with him. It might even be argued that this particular statement is exculpatory of Stone. As such, *Bruton* and its offspring do not apply.[4]

Even assuming, for the sake of argument, that Cornist's statement did violate the *Bruton* line of cases—when viewed in the context of the remaining evidence—any error would be harmless beyond a reasonable doubt. In order to determine whether this error is harmless, this Court must decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction . . . or, put otherwise, whether the error was harmless beyond a reasonable doubt." *Talbott v. Commonwealth,* 968 S.W.2d 76, 84 (Ky. 1998) (quoting *Chapman v. California,* 386 U.S. 18, 23, 24 (1967)). The U.S. Supreme Court has held that:

> An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.

*Coy v. Iowa,* 487 U.S. 1012, 1021-22 (1988). The basis of the remaining evidence includes the surveillance footage of Stone, Detective Andrews' identification of Stone by his tattoo in the photograph from the Cornist family

---

[4] Stone also alleges this statement violates *Crawford v. Washington* since it clearly is testimonial. 541 U.S. 36 (2004). However, Stone ignores this statement is admissible under KRE 801A(b)(1) as an admission against party opponent for Cornist.

reunion and the testimony of Thompson. Furthermore, Detective Andrews testified he listened to Stone's recorded jail phone calls wherein Stone admitted being the other male on the surveillance video and having entered Thompson's residence and "grabbed him out the house." Additionally, Stone conceded on the phone calls that Cornist was his uncle. Stone's own testimony admitted that he was on the elevator with Cornist and the unknown woman. The admission of Cornist's statement did not violate the principles espoused by *Bruton,* but even if it did, we hold it was harmless beyond a reasonable doubt.

**B. The trial court did not err by permitting Detective Andrews to identify Stone from a database available to law-enforcement.**

Stone claims that Detective Andrews identified him through a "law enforcement database." This, Stone claims, is a violation of KRE 404(b), as the jury could infer this identification was because Stone had a prior criminal history. This issue is preserved. KRE 404(b) states that:

> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

In asserting this claim, Stone insists that the Commonwealth characterized the database as a "law enforcement database" when that is a complete mischaracterization of the evidence. The Commonwealth elicited from

7

Detective Andrews how he was able to ascertain the identity of Stone through a "database available to Kentucky law enforcement." In fact, the testimony from Detective Andrew was that he was able to find a photograph from a social media platform of the "Cornist Family Reunion" where there was a photograph of Stone with the identical tattoo as seen on the surveillance footage from the incident at Golden Tower. There was no reference to any mugshots or criminal background and the database from which the identification was made came from an innocuous source. Therefore, Stone's claim is wholly without merit.[5]

### C. The trial court did not err when it declined to grant a directed verdict on the burglary and robbery in the first-degree charge.

Stone claims the trial court should have granted a directed verdict on the burglary-in-the-first-degree charge and robbery in the first degree.[6] These issues are preserved. This Court has previously stated that:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

---

[5] Stone also claims the Commonwealth failed to provide written notice as required by KRE 404(c). But as we held there is no merit to Stone's claim under KRE 404(b), we decline to address this issue.

[6] Although originally indicted on complicity on both these charges, the trial court's instructions gave the jury an option to convict on either complicity to these charges or to convict on the underlying charges. The jury unanimously decided to convict on burglary and robbery in the first-degree.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). The standard of review for an appellate court on reviewing a lower court's decision regarding a directed verdict is, "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.*

The Commonwealth, in order to convict a person of burglary in the first degree, under KRS[7] 511.020(1)(b) must prove beyond a reasonable doubt that:

> A person is guilty of burglary in the first degree when, with the intent to commit a crime, he or she knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or she or another participant in the crime: . . . (b) Causes physical injury to any person who is not a participant in the crime[.]

Stone claims the trial court should have granted a directed verdict on the burglary-in-the-first-degree charge because there was no evidence that Stone entered or remained in Thompson's apartment unlawfully with the intent to commit a crime therein. This court has long held that "[i]ntent can be inferred from the actions of an accused and the surrounding circumstances. The jury has wide latitude in inferring intent from the evidence." *Anastasi v. Commonwealth*, 754 S.W.2d 860, 862 (Ky. 1988).

In making this argument, Stone relies almost exclusively on Stone's version of events. Stone testified his intentions that day were wholly irenic and that he was simply there to defuse tensions amongst old friends when Thompson and Cornist began fighting. According to Stone, it was only after

---

[7] Kentucky Revised Statutes.

Thompson began striking him that he was obliged to defend himself. But Stone's testimony is not the only evidence the jury heard during the trial. The jury viewed the video in which all three appeared to act in a coordinated attempt to entice Thompson to open his door so that they could enter his dwelling and assault and rob him of any valuables. They heard Thompson testify that he opened the door when an unknown woman knocked on his door. After Thompson opened the door, Stone and Cornist immediately entered his apartment, and Stone began assaulting him. Thompson heard one of them tell the other to get the T.V. and heard Stone ask Cornist "where's the money at, man?" The jury heard Stone's testimony but chose to reject his version of events and since there was more than enough evidence for the jury to convict on the charge of burglary in the first degree, it was not clearly unreasonable to do so. As such, the trial court did not err by refusing to grant a directed verdict on the charge of burglary in the first degree.

Stone also contends that the trial court erred by failing to grant a directed verdict on the robbery-in-the-first-degree charge because he claims the Commonwealth did not prove Stone had the requisite intent to commit a robbery. As noted above, the jury has wide latitude to infer intent from the evidence. *Id.*

The Commonwealth, in order to convict a person of robbery in the first degree under KRS 515.020(1)(a), must prove beyond a reasonable doubt that:

> A person is guilty of robbery in the first degree when, in the course of committing theft, he or she uses or threatens the immediate use of physical force upon another person with intent to

10

accomplish the theft and when he or she: (a) Causes physical injury to any person who is not a participant in the crime[.]

This Court has held, and Stone concedes in his brief, that the element "in the course of committing theft" can be proven by evidence of a completed theft or an attempted theft. *Sasser v. Commonwealth,* 485 S.W.3d 290, 293 (Ky. 2016).

Stone, is seen on surveillance footage rummaging through the pockets of Thompson looking for something of value to steal, and Thompson heard Stone ask, "where's the money at, man?" While Stone testified that he put his hands in Thompson's pocket to help him, the jury clearly thought otherwise. The jury concluded that Stone's intent was to attempt to steal something of value and he used physical force in order to accomplish the attempted theft. As this Court cannot say it was clearly unreasonable for the jury to reach that conclusion, we hold the trial court did not err by refusing to grant a directed verdict for Stone.

### D. The Commonwealth's comments during closing arguments were not improper.

Lastly, Stone argues that the Commonwealth's comments made during closing arguments were improper. Stone argues the prosecutor unjustly impugned Stone's defense counsel's closing argument as rooted in racial bias and urges this Court to apply the *Dickerson v. Commonwealth* four-factor analysis to find a violation of Stone's right to a fair trial. 485 S.W.3d 310, 329 (Ky. 2016).

11

Stone concedes this issue is unpreserved, and as such we will review his claim under our palpable error standard under RCr[8] 10.26. *Early v. Commonwealth,* 470 S.W.3d 729, 737 (Ky. 2015).  For an error to be palpable it must be "easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth,* 206 S.W.3d 343, 349 (Ky. 2006) (quoting *Burns v. Level,* 957 S.W.2d 218, 222 (Ky. 1997)). An unpreserved error may be corrected on appeal if failure to do so would cause a manifest injustice. *Commonwealth v. Goss,* 428 S.W.3d 619, 626-27 (Ky. 2014).  This is an error that if it remained uncorrected, there would be a likelihood of a different result, or it would call into question the defendant's right to due process. *Id.* at 627.

Stone's defense counsel argued during closing statements that these events were just a "stupid street fight that got out of hand."  The Commonwealth in response told the jury,

> Folks, the defense wants you to believe that this is overblown and overreacted and overcharged. In fact, they refer to this as a stupid street fight. And that is what—this why I had voir dire on it because that really offends me. This isn't a stupid street fight.
>
> First of all, it's not a fight. It's a beating. It didn't take place on the street. It started in James's castle, his residence, where he is supposed to be safe. The only reason they are saying this, that this was a stupid street fight, is because it is a poor black man living in government subsidized housing in downtown Covington.
>
> Pretend this hallway is a porch of a nice big house in Independence or Edgewood or Villa Hills, Fort Mitchell, Lakeside Park, and these two men bull rush into the front door in that nice big house. And the next thing we see on the security video is these two men beating the man that lives there as he falls out of his own house. Beat him to the ground. Kick him in the face. Fracture his arm. Break his skull.

---

[8] Kentucky Rules of Criminal Procedure.

Would we be calling this a stupid street fight? Would we be calling this case overcharged if this happened in Independence, Villa Hills, Edgewood, or Fort Mitchell? No, we wouldn't. It's prejudice. They want you to believe this poor black man is not entitled to the same protection under the law as every other resident of the Commonwealth of Kentucky and every other neighborhood in Kenton County.

Let your verdict tell Mr. Stone and Mr. Cornist that yes, James is protected, just like every other resident of the Commonwealth of Kentucky and every other community in Kenton County. The law applies the same.

Stone claims that the Commonwealth's comments were improper because it implied that Stone's defense counsel was making appeals to racial bias by calling what happened to Thompson the product of a "stupid street fight." He argues that in doing so the Commonwealth impugned the integrity of defense counsel. This unwarranted injection of allegations of racial bias, Stone claims, is sufficient grounds for this Court to overturn the verdict and remand for a new trial under the *Dickerson* four factors test. In *Dickerson* we held:

> We use the following four-factor test to determine whether a prosecutor's improper comments constitute reversible flagrant misconduct: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused."

*Dickerson v. Commonwealth,* 485 S.W.3d 310, 329 (Ky. 2016) (quoting *Mayo v. Commonwealth,* 322 S.W.3d 41, 56 (Ky. 2010)).

The Commonwealth's remarks can be characterized by an appeal to the jury to treat everyone the same, no matter where they live or how they look. We do take note here that the Commonwealth made its comments to directly rebut

Stone's defense counsel's contention that what happened to Thompson was a stupid street fight. The Commonwealth was not entirely off base to suggest this characterization had implicit racial undertones with a concomitant appeal not to take this incident too seriously. As such, it is not entirely clear that *Dickerson* should even apply in a situation where the Commonwealth makes comments to directly rebut an implication made by the defendant in closing remarks. But for the sake of argument, we now undertake the analysis.

Under the first part of the test as expounded by *Dickerson,* we must determine whether the Commonwealth's remarks tended to mislead the jury or caused prejudice to the defendant. Here we cannot find the Commonwealth's appeal to treat everyone equally, and its objection to Stone's characterization as rooted in racial bias, as having done so. As for the second part of the test, this Court must determine whether the comments were isolated or extensive. The Commonwealth's portion of its closing that Stone now finds objectionable is not more extensive than necessary in order to counter the defense's own ill-considered remark. Likewise, the third factor of the *Dickerson* test is whether the Commonwealth injected its remarks intentionally. It is clear, in this case, the Commonwealth intentionally made these remarks. That, however, should carry little weight when the Commonwealth was merely responding to the intentional injection of material by Stone's own counsel. Finally, the last factor is the strength of the evidence against the accused. Here, the evidence was overwhelming as to the guilt of Stone, so this Court cannot find, after the

weighing of these factors, sufficient grounds in order to find palpable error, and thus, we decline to overturn the conviction.

### III.   CONCLUSION

Based on the foregoing, we find the trial court committed no error that could form the basis for overturning the judgement of the Kenton County Circuit Court. Therefore, we affirm the judgment of the trial court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Julia K. Pearson
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Robert Baldridge
Assistant Attorney General